```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JAMES BAILEY,                                          :
                                                       :
                Plaintiff,                             :           **MEMORANDUM AND ORDER**
                                                       :           01 CV 2250 (DLI) (LB)
        -against-                                      :
                                                       :
NEW YORK CITY BOARD OF                                 :
EDUCATION, MARTIN BLUM, and                            :
JOHN LEE,                                              :
                                                       :
                Defendants.                            :
-------------------------------------------------------x
```
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff James Bailey ("Plaintiff") brings this employment discrimination action against defendants New York City Board of Education ("BOE"), Martin Blum, and John Lee (together, "Defendants") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981. Plaintiff alleges that Defendants' decision to bring disciplinary charges against him was impermissibly based on race and that he was constructively discharged from his employment by the BOE.

Defendants now move for summary judgment. For the reasons set forth below, Defendants' motion for summary judgment is granted.

**I.      Facts**

The following facts are undisputed or, where disputed, construed in a light favorable to Plaintiff.

**A.      Background**

Plaintiff, an African American male, is a retired mathematics teacher formerly employed by

1

the BOE for about thirty-eight years from 1962 until 2001. (Def.'s 56.1 ¶¶ 2, 34; Pl.'s 56.1 ¶¶ 2, 34; Bailey Decl. ¶ 2.) During the 1997-1998 school year, Plaintiff took a sabbatical from the BOE, during which period he enrolled full time at LaGuardia Community College, taking graduate-level mathematics classes. (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) Plaintiff was still an employee of the BOE during his sabbatical and was, accordingly, paid 70% of his regular salary and full medical benefits. (Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.)

On March 23, 1998, Plaintiff was arrested for possession of a .38 caliber pistol and was charged with criminal possession of a weapon in the fourth degree. (Def.'s 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) Although section nine of BOE Chancellor's Regulation C-105 provides that all BOE employees must immediately report any arrest to the BOE's Office of Personnel Investigations ("OPI"), Plaintiff did not immediately report his arrest as required. (*See* Bardavid Decl. Ex. D; Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) On May 1, 1998, Plaintiff pled guilty to misdemeanor possession of a weapon and was sentenced, on July 9, 1998, to thirty days in jail, which he served during his sabbatical year. (Def.'s 56.1 ¶ 9; Bailey Decl. ¶ 6.) Plaintiff did not, at that time, report his conviction to the BOE. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.)

B.    **Fingerprint Referral Form**

Upon completion of his sabbatical leave, Plaintiff was assigned, in September 1998, to Beach Channel High School as a full-time mathematics teacher. (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.) On or about March 4, 1999, Plaintiff resubmitted fingerprints to the BOE. (*See* Bardavid Decl. Ex. E.) In connection with the fingerprinting process, Plaintiff filled out a fingerprint referral form. (*See* Bardavid Decl. Ex. E.) One question on the fingerprint form asked, "Have you ever been convicted of or pled "GUILTY" or pled "NO CONTEST" to any offense in this state or elsewhere? (i.e.,

Felonies, Misdemeanors and Violations, except minor traffic infractions)." (Bardavid Decl. Ex. E.) In response, Plaintiff checked the "YES" box and listed the 1998 conviction. (*See* Bardavid Decl. Ex. E.)

The fingerprint search revealed that Plaintiff had also been arrested in 1989 for grand larceny, criminal bribery, and criminal solicitation and that he was convicted upon a plea of guilty to petty larceny and was sentenced to thirty days of jail time. (Def.'s 56.1 ¶¶ 19-20; Pl.'s 56.1 ¶¶ 19-20; Bardavid Decl. Ex. F.) Plaintiff had not listed the 1989 conviction on the fingerprint referral form, allegedly due to his misunderstanding that the questionnaire sought information limited to convictions that occurred in the preceding ten years. (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22; Bailey Decl. ¶ 7.)

### C. BOE Investigation and Plaintiff's Administrative Assignment

As a result of Plaintiff's prior arrests and convictions, and their untimely reporting, OPI initiated an investigation on October 15, 1999 in order to determine whether charges pursuant to New York Education Law § 3020-a ("§ 3020-a") would be brought, or "preferred," against Plaintiff.[1] (Def.'s 56.1 ¶ 23; Bardavid Decl. Ex. F.) In early November 1999, Plaintiff was removed from his teaching assignment. (Bailey Decl. ¶¶ 8-9.) Superintendent John Lee directed Plaintiff to report to Martin Blum, Director of Operations at the Queens High Schools Office, for an administrative assignment. (Stark Decl. Ex. B.) Plaintiff alleges that Blum greeted him upon his arrival at the Queens Superintendent's Office and notified him that § 3020-a charges against him were being considered. (Bailey Decl. ¶ 9.) Blum allegedly stated to Plaintiff, "I am the gatekeeper" and "I make

---

[1] A tenured teacher cannot be disciplined unless found guilty of disciplinary charges after a full adjudicatory hearing. *See* N.Y. Education Law §§ 3020, 3020-a.

3

the decisions." (Bailey Decl. ¶ 9.) According to Plaintiff, Blum was referring to his authority and discretion concerning whether § 3020-a charges would be made against Plaintiff. (Bailey Decl. ¶ 9.)

After Plaintiff's alleged discussion with Blum concerning possible § 3020-a charges, Plaintiff reported to the Disciplinary Holding Hall or the so-called "rubber room," where teachers with pending investigations or charges were temporarily assigned. (Bailey Decl. ¶ 10.) Plaintiff states that there were eighteen to twenty individuals assigned to the rubber room while he was there. (Bailey Decl. ¶ 10.) Of these individuals, Plaintiff believes that eight were Caucasian and eleven, including Plaintiff, were either African American or Hispanic. (Bailey Decl. ¶ 10.) Plaintiff alleges that Blum knew each individual by name and that he "encountered" each individual on a daily basis. (Bailey Decl. ¶ 10.)

### D. Section 3020-a Charges

The decision concerning whether § 3020-a charges will be preferred involves a multi-level process.[2] Following the investigation of an individual by the Office of Special Investigations or the appropriate administrative office, that office issues its findings and recommendation to the Superintendent. (Blum Dep. 17.) The matter is further discussed in a meeting involving the Chancellor's Office of Legal Services and other administrative offices, which offices then issue their recommendation as to whether § 3020-a charges should be made. (Blum Dep. 17-18.) Based on this recommendation, the Superintendent's Office, in turn, makes its final determination regarding

---

[2]New York Education Law § 3020-a.2.(a) articulates the procedures formally required in bringing charges against an individual pursuant to that section. What follows is Blum's description of how these procedures are carried out in practice.

whether charges should be preferred against the individual.[3] (Blum Dep. 18, 23.) In the instant case, the Superintendent's decision was delegated to Blum. (Blum Dep. 17-18, 23.)

On November 24, 1999, Superintendent Lee recommended that § 3020-a charges be preferred against Plaintiff. (Stark Decl. Ex. D.) Plaintiff was served on March 16, 2000 with four charges relating to his 1998 arrest and conviction and his failure to report them pursuant to Chancellor's Regulation C-105, as well as his failure to list his 1989 arrest and conviction on his March 4, 1999 fingerprint referral form. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26; Bardavid Decl. Ex. G.) After the charges were made, the United Federation of Teachers (the "UFT") provided Plaintiff with legal representation. (Bailey Dep. 49; Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.)

### E. Alleged Disparate Treatment

Plaintiff alleges that Blum treated the Caucasian teachers in the rubber room better than the African American and Hispanic teachers stationed there. (Bailey Decl. ¶ 11.) According to Plaintiff, the teachers were instructed to prepare lesson plans but were not informed of the grade level for which they were to prepare the lesson plans, nor provided any materials with which to carry out the task. (Bailey Decl. ¶ 11 n.1.) None of the teachers, therefore, completed the assigned task, but Plaintiff claims that "Blum only criticized and threatened the Minorities."[4] (Bailey Decl. ¶ 11 n.1.)

Plaintiff further alleges that the decision regarding whether to prefer charges against a teacher was discriminatory. According to Plaintiff, ten of the eleven African American and Hispanic

---

[3] The parties dispute whether the decision by the Superintendent's Office is merely a "rubber stamp" approval of the recommendation made by the Chancellor's Office of Legal Services and the other participating administrative offices.

[4] Plaintiff does not explain how Blum allegedly criticized and threatened the African American and Hispanic teachers.

5

teachers in the rubber room, including Plaintiff, were subjected to § 3020-a charges, whereas only three of the eight Caucasian teachers were charged.[5] (Bailey Decl. ¶ 12.) In particular, Plaintiff identifies two Caucasian teachers, Ira Kamensky and William Millo, allegedly in situations similar to Plaintiff's, who were assigned to the rubber room around the same time as Plaintiff. (Bailey Decl. ¶ 12.) Kamensky purportedly informed Plaintiff that he had been employed by the BOE for over thirty years and was assigned to the rubber room as a result of felony charges against him and a conviction based on a plea of guilty to a misdemeanor, as well as his failure to properly report his arrest and conviction to the BOE. (Bailey Decl. ¶ 12.) Nonetheless, no charges were preferred against Kamensky, who was instead returned to a teaching assignment. (Bailey Decl. ¶ 12; *see* Stark Decl. Ex. G.) Plaintiff further claims that Millo "was removed from teaching due to a criminal proceeding against him" but did not ultimately receive any § 3020-a charges and was also returned to a teaching assignment.[6] (Bailey Decl. ¶ 12; Bailey Dep. 57:12-58:17.)

### F. Plaintiff's Complaints and Subsequent Retirement

Plaintiff filed a discrimination complaint with the Equal Employment Opportunity ("EEO") Office in November of 2000, describing the apparent disparity in treatment between a white male teacher (presumably Kamensky) and himself with respect to the decision to prefer § 3020-a charges. (Bailey Decl. ¶ 13; Stark Decl. Ex. H.) Plaintiff also confronted Blum with his allegations of discrimination, but Blum purportedly stated that race was not a factor in determining whether § 3020-a charges are preferred. (Bailey Decl. ¶ 13.)

---

[5]The BOE claims that five of the eight Caucasian teachers were charged and four of the nine African American and Hispanic teachers were charged. However, the record does not provide definitive evidence on this point, and the court construes these facts in favor of Plaintiff.

[6]Plaintiff does not explain how he received this information.

6

In addition, Plaintiff asserts that he wrote to the Special Commissioner of Investigation for the New York City School District to seek redress for the allegedly discriminatory application of New York Education Law § 3020-a.[7] (Bailey Decl. ¶ 13.) Plaintiff does not state what the outcome of his discrimination charge with the EEO Office was, or what response he received to his alleged letter to the Special Commissioner.

A hearing on Plaintiff's § 3020-a charges was set for sometime in March of 2001. (Bailey Dep. 105:20-24.) Plaintiff asserts that he consulted with Robert Simmelkjaer, purportedly an arbitrator for the BOE and a friend of Plaintiff's. (Bailey Decl. ¶ 14.) According to Plaintiff, Simmelkjaer advised him that people of color were terminated at § 3020-a hearings at a disproportionately higher rate than Caucasians.[8] (Bailey Decl. ¶ 14.) Simmelkjaer also allegedly informed Plaintiff that his allegations of discrimination would not be considered at the § 3020-a hearing and that the hearing would be limited to only the charges against Plaintiff. (Bailey Decl. ¶ 14.) Plaintiff further states that Simmelkjaer recommended that Plaintiff retire in order to preserve his medical benefits. (Bailey Decl. ¶ 14.) Accordingly, because Plaintiff believed that the hearing would not address his allegations of discrimination and because he did not want to lose his medical insurance coverage, Plaintiff retired from the BOE on February 1, 2001, rather than challenge the charges against him at the scheduled hearing. (Bailey 105:25-106:9; Bardavid Decl. Ex. I.)

## II. Discussion

---

[7]Plaintiff did not provide the court with a copy of this letter.

[8]The BOE contends that Simmelkjaer's alleged statements are inadmissible hearsay. However, if Simmelkjaer is or was in fact a BOE arbitrator, the statement may be admissible as an admission by party-opponent. *See* FED. R. EVID. 801(d)(2). Accordingly, for the purposes of this summary judgment motion, the court will consider Simmelkjaer's alleged statements.

A. **Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©. The burden is upon the moving party to demonstrate that no genuine issue with respect to any material fact exists. *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 1776. Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). However, summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases." *Abdu Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). To defeat a motion for summary judgment, however, the nonmoving party "must provide more than conclusory allegations of discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.

1997). There is no genuine issue of material fact for trial unless sufficient evidence in the record exists favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. (internal citations omitted).

### B. Discrimination Claim

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment. In order to establish a discrimination claim under this statute, a plaintiff must allege facts sufficient to support a *prima facie* case. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-253 (1981). To demonstrate a *prima facie* case of discriminatory discharge in violation of Title VII or 42 U.S.C.§ 1981, a plaintiff must submit evidence of the following: (1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he was discharged or subjected to an "adverse action," and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of the membership in a class. *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir. 2001); *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir. 1997) (citations omitted); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987).

Where there is an absence of direct evidence of discrimination, the Supreme Court has established a three-step burden-shifting framework to analyze Title VII claims. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-803 (1973); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508 (1993). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a *prima facie* case of retaliation. *McDonnell Douglas Corp.*, 411 U.S. at 802. The employee's burden of proof at the *prima facie* stage is *de minimus*, but the employee must

9

proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir. 1995); *Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001). The defendant may then rebut by articulating a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* The defendant's burden at this stage is merely one of production, not persuasion. *See St. Mary's Honor Ctr.,* 509 U.S. at 511. However, once the defendant meets this burden, "[t]he presumption of [retaliation] . . . drops out of the picture." *Id.* at 510-11 (internal quotation marks and citation omitted). The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment action was motivated by unlawful discrimination. *See Stern v. Trs. of Columbia Univ. in the City of N.Y.,* 131 F.3d 305, 312 (2d Cir. 1997). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs,* 450 U.S. at 253.

The only element Defendants dispute with respect to Plaintiff's *prima facie* case is the third element concerning whether there was an adverse action. Plaintiff alleges that he was constructively discharged, thereby purportedly establishing the adverse action element. Defendants contend that Plaintiff cannot claim he was constructively discharged because he voluntarily retired.

The court finds that Defendant was not constructively discharged. While a constructive discharge satisfies the adverse action element, a constructive discharge occurs only "when [the plaintiff's] employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003); *see also Lopez,* 831 F.2d at 1188. The fact that the BOE brought § 3020-a charges

against Plaintiff does not, in itself, create an intolerable work atmosphere converting Plaintiff's resignation into a constructive discharge.[9] *See Carmellino v. Dist. 20 of the N.Y. City Dep't of Educ.*, No. 03 Civ. 5942 PKC, 2006 WL 2583019, at *54 (S.D.N.Y. Sep. 6, 2006) (stating that "no reasonable jury could find that the mere fact that defendant [Department of Education] had accused [the plaintiff] of incompetence, insubordination, conduct unbecoming and neglect of duty" amounted to an intolerable work atmosphere). Moreover, when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge. *Id.*; *Silverman v. City of N.Y.*, 216 F. Supp. 2d 108, 115-16 (E.D.N.Y. 2002).

Plaintiff argues that he is not precluded from alleging constructive discharge because the scheduled § 3020-a hearing at which he could have responded to the disciplinary charges would not, he contends, have permitted him to challenge the charges on the ground that they were brought against him on a discriminatory basis. In support of his contention, Plaintiff claims that Simmelkjaer, a friend of his who was allegedly an arbitrator for the BOE, had informed him that only the disciplinary charges–and not Plaintiff's discrimination claim–would be considered at the § 3020-a hearing. Simmelkjaer also allegedly informed Plaintiff that people of color facing § 3020-a charges were terminated in disproportionately high numbers, and he purportedly advised Plaintiff to retire in order to retain medical benefits.

---

[9]Plaintiff argues that proof of a threat of termination and loss of benefits may be sufficient to establish constructive discharge, citing the Second Circuit's decision in *Lopez v. S. B. Thomas, Inc.*, 831 F.2d 1184 (1987). However, *Lopez* does not address whether the threat of loss of benefits establishes constructive discharge. Moreover, among other factual differences in *Lopez* from the instant case, the plaintiff there alleged that his supervisor informed him he would be fired at the end of his probationary period regardless of whether he improved his allegedly deficient performance. 831 F.2d at 1188. Here, unlike *Lopez*, Plaintiff was offered an opportunity to defend himself against the § 3020-a charges at a hearing. The fact that termination was one possible outcome of the hearing does not constitute a threat of termination sufficient to establish constructive discharge.

As the BOE correctly points out, nothing in § 3020 or § 3020-a of New York Education Law expressly prevented Plaintiff from raising his complaints concerning Blum's allegedly discriminatory practice in preferring § 3020-a charges. To the contrary, § 3020-a 3.c(I) broadly permits an employee "a reasonable opportunity to defend himself or herself and an opportunity to testify in his or her own behalf," as well as "the right . . . to cross-examine witnesses." N.Y. Education Law § 3020-a3.c(I). Plaintiff's only evidence to substantiate his contention that he could not have raised his discrimination claim at the § 3020-a hearing is his own declaration recounting the alleged statement of a friend he claims was an arbitrator for the BOE. Plaintiff did not provide the court with an affidavit by Simmelkjaer attesting that he made the alleged comments, nor any explanation for the absence of such an affidavit by Simmelkjaer. In any event, Plaintiff's subjective belief that his discrimination claim would not have been considered at the hearing in no way compels the court to read such a restriction into § 3020-a that is clearly not present in the plain language of the statute. The fact that Plaintiff's belief was based on an informal conversation with his friend, the purported BOE arbitrator, does not change the analysis, particularly in light of the fact that Plaintiff had the assistance of counsel provided by the UFT.

Plaintiff has not shown constructive discharge and has thus failed to establish the adverse action element in his *prima facie* case.[10]

---

[10] In light of this holding, the court declines to reach the issue of qualified immunity raised by the BOE in its submission.

## III.     Conclusion

For all of the foregoing reasons, the court holds that Plaintiff has failed to establish a *prima facie* case of Title VII discrimination.  Thus, Defendant's motion for summary judgment is granted in its entirety.

SO ORDERED.

DATED:     Brooklyn, New York
                    November 19, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge